UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
|  | Case No. |
| RONALD E. WALLS, | ) |
|  | ) |
|    Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| UNUM GROUP and UNUM LIFE INSURANCE | ) |
| COMPANY OF AMERICA | ) |
|    Defendants. | ) |

## COMPLAINT FOR DAMAGES WITH JURY DEMAND

Plaintiff Ronald E. Walls ("Mr. Walls") brings this action against Defendants Unum Life Insurance Company of America ("Unum Life"), and Unum Group, for failing to pay lifetime disability insurance benefits after Mr. Walls suffered an injury that prevents him from working in his occupation or a less demanding occupation.

## PARTIES

1. The Plaintiff, Ronald E. Walls, ("Mr. Walls") is an individual having a usual place of residence in Cumberland County, Maine.

2. The Defendant Unum Life Insurance Company of America ("Unum Life") is an insurance company existing under the laws of the State of Maine, having a principal place of business at One Fountain Square, Hamilton County, Tennessee, and is a licensed foreign insurer having a substantial place of business at 1 Mercantile Street, Worcester, Worcester County, Massachusetts,.

3. The Defendant Unum Group is a corporation existing under the laws of the State of Delaware, having a principal place of business at One Fountain Square, Hamilton

County, Tennessee, and having a substantial place of business at 1 Mercantile Street, Worcester, Worcester County, Massachusetts.

## JURISDICTION AND VENUE

4. Personal jurisdiction is predicated against all Defendants as they are both doing business in Worcester County in the Commonwealth of Massachusetts.

5. This action involves a controversy exceeding seventy-five thousand dollars ($75,000.00).

6. This Court has diversity jurisdiction over this litigation arising under 29 U.S.C. §1132 as Mr. Walls is a citizen of Maine, and Unum Life and Unum Group are citizens of Maine and Tennessee and both have a substantial place of business at 1 Mercantile Street, Worcester, Worcester County, Massachusetts.

## FACTS COMMON TO ALL COUNTS

### A. *Information about Unum Group and Unum Life Structure*

7. Unum Group is an insurance holding company that controls the activities of its insurance subsidiaries, including Unum Life and others pursuant to a General Services Agreement and other documents governing the operation of Unum Life.

8. Defendants Unum Group and Unum Life are collectively referred to sometimes hereafter as "the Unum Defendants."

9. Defendant Unum Group operates and controls a number of insurance companies, including Unum Life. None of the insurance companies employ their own employees. Instead, the claims processes of all the insurance companies are consolidated into a claims operation which is operated entirely by Unum Group and by employees, all of whom are employed by Unum Group.

10. Unum Group adjudicates individual disability insurance claims at the Worcester Benefits Center located at One Mercantile Street, Worcester, Massachusetts.

B. *Unum Group Has A Documented History Of Unfair Claims Denials.*

11. Unum Life and the Unum Group have a history of parsimonious claim denials specifically set forth in the Findings of and Facts and Conclusions of Law of United States District Judge James C. Mahan dated November 14, 2008, Merrick v. Paul Revere, 594 F.Supp.2d 1168 (D. Nev. 2008). A copy of the Findings of Fact and Conclusions of Law are attached herewith as **EXHIBIT A**.

12. Similar conclusions are set forth in a law review article by the leading ERISA scholar, John H. Langbein, Sterling Professor of Law, Yale University, Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials under ERISA, 101 Northwestern Univ. Law Review 1315 (2007).

13. As late as 2012, the Ninth Circuit Court of Appeals commented on Unum Groups practices of claim denials. *Stephan v. Unum Life Insurance Company of America*, 697 F.3d 917 (9th Cir. 2012)

14. On November 18, 2004, Unum Group entered into the Regulatory Settlement Agreement ("RSA") with 47 state regulators, including the Commissioner of Insurance for the Commonwealth of Massachusetts and the State of Maine, both of whom served as legal market conduct study regulators. Unum Group entered into a separate agreement with the Commissioner of Insurance for the State of California and a few other states. Unum Group paid a $15 million in fines, and its insurance subsidiaries agreed to implement a corrective plan of action set forth in the RSA which resulted in payments approaching $700 million dollars to claimants whose benefits had been

wrongfully denied or terminated.

15. Unum Group and its claims personnel agreed to implement the changes agreed to under the RSA within and throughout the Unum Group and the insurers within its control, including Unum Life.

16. Unum Group and its insurers told regulators that it made changes required in the RSA, but in reality has refused to make all of the changes it agreed to make, and Unum Group has continued to deliberately operate its claims department in a manner intended to create a basis to deny disability claims and to increase its profits at the expense of insureds by continuing to deny their legitimate claims. Many of the practices which Unum Group and its insurers agreed not to employ were, in fact, employed to deny Mr. Walls' claim for life-time benefits.

C. *Information about Unum Group Closed Block.*

17. One of the operating segments within the Unum Group is the Closed Block.

18. The Closed Block includes group and individual long-term care insurance policies, individual disability insurance policies, and various smaller blocks of insurance policies no longer actively marketed by the Unum Group.

19. Many years ago Unum Group made the decision to discontinue selling certain product lines, such as long-term care insurance policies and certain individual-disability insurance policies that had particularly generous benefits for the insured, and separated them from Unum Group's ongoing business operations for financial reporting purposes.

20. Although the premium associated with the Closed Block is small, more than 30 percent of Unum Group's capital is tied-up in the Closed Block. The Closed Block segment comprises over $17 billion in policy reserves with estimated annual pre-tax earnings of $100 million - $130 million on the allocated capital

21. In the Unum Group 2011 annual report to shareholders, Unum Group admitted that it had guessed on how to reserve for lifetime disability benefits, and that the cost of these benefits to the Unum Group was greater than anticipated when the policies had been sold long ago.

Unum Group wrote in part

There is very little industry experience for lifetime disability benefits, as our insurance companies were the primary disability companies in the insurance industry at the time lifetime disability benefits were offered. These benefits were offered during the 1980s and 1990s, recent enough such that claimants are just reaching the older ages and providing us with data to build our claim experience base. Emerging experience indicates a longer life expectancy for our older age, longer duration disabled claimants, which lengthens the time a claimant receives disability benefits. As a result of this experience, as of December 31, 2011 we adjusted our mortality assumption within our claim resolution rate assumption and, as a result, increased our claim reserves for our individual disability closed block or business by $133.5 million and decreased net income by $119.3 million. The increase in reserves represented a 1.5 percent increase in individual disability policy and claim reserves as of December 31, 2011, which equal $11.9 billion subsequent to the charge.

22. Mr. Walls' individual-disability insurance policies, which are the subject of this litigation, are contained and managed by the Unum Group in the Closed Block segment.

23. Managing the Closed Block is a focus of Unum Group that takes a lot of effort and attention from Unum Group management.

D. *Information About Compensation Available To Persons Decided Claims.*

24. Claims employees and physicians are employed by Unum Group and used among all Unum Group insurance subsidiaries owned either directly or indirectly by Unum Group. The physicians and employees process claims for all of the insurance subsidiaries

5

without distinction, and the methods employed to handle claims among all insurers are coordinated by high-level claims personnel and employed throughout the claims of all insurers under the Unum Group.

25. The details of this relationship are set-forth in the affidavit of William T. Bradley of the Unum Group and attached herewith as **EXHIBIT B**.

26. A fundamental principle and standard for disability insurance companies is that a claims handler must make claims decisions based on the merits of each claim, without the influence of any artificial or arbitrary incentive or disincentive and without influence of financial considerations that may affect the insurance company's profitability.

27. In businesses other than disability insurance claims handling, there may be nothing wrong with performance objectives, emphasis on company profits, or other incentives which corporate management may communicate to its employees.

28. Disability insurance handling is different than other businesses as performance goals, emphasis on company profits, incentives, and other undue influences, are highly inappropriate for numerous reasons. Disability insurance companies primarily generate income through: (a) their underwriting departments, which determine and charge premiums to policyholders; and, (b) the investment department, which invests the premiums paid by policyholders. The claims department should not be managed as a profit center and any communication to the claims handlers that suggests otherwise will likely have a significant influence on their work adjudicating claims at the expense of the policyholder.

29. The claims handler's job is to pay covered claims that are honestly made, without even the possibility that the claims handler will be influenced by performance goals or the

impact of granting a claim on the company's revenue or profitability.

30. Unlike other commercial enterprises, the business of insurance involves the sale of promises where the policyholder pays premiums to the disability insurance company in consideration for payment if the policyholder is disabled from work due to accident or sickness.

31. Rather than considering each claim on an individual basis, Unum Group has a stated goal of reducing the benefit ratio. In order to reach this goal, Unum Group makes claim decisions not always on the merits of each claim but in-part by setting company-wide goals to eliminate claims which free funds tied up in claim reserves.

32. Unum Group tracks financial data pertaining to claims, and review specific claims reserves attributable to a particular insured through databases that can be viewed through other databases sometimes called Operations Metrics and Reporting ("OMAR"), a relational database.

33. E-mails or printed documents are sent routinely by management to the claims handlers that discuss monthly, quarterly, and yearly historic targets/goals, recoveries, reserves, expected resolution dates ("ERD"), and advance pay and close ("AP&C") of claims.

34. "Recoveries" or "claim closure" are words to describe claims that terminate, meaning Unum Group no longer must pay benefits to a policyholder.

35. Statistics are maintained and provided to high-level Unum Group claims personnel for all of the insurers within the Unum Group, compared with each other and used to increase the profitability of the claims operation of each insurer at the expense of legitimate claims.

36. The Unum Group Worcester Benefits Center manages individual-disability insurance policies focusing on "claims forecasting" and "recoveries."

37. Unum Group permits claims handlers to learn about financial reserves, and requests that claims handlers make "recoveries" at specified times and to provide lists of ERD on a specified basis. This may cause claims handlers to make benefit decisions based on financial goals rather than always examining the merits of each claim.

38. The typical management structure in the Worcester Benefit Center has a disability specialist as the front line claims handler; the disability specialist reports to a lead disability specialist sometimes called a director; the director has a number of disability specialists under supervisor; the director reports to an Assistant Vice-President who supervise a number of directors; the Assistant Vice President reports to one or two Vice-Presidents who manage the Worcester Benefit Center operation.

39. In 2005, Unum Group established the "Manager Toolkit 2005 Business Plan & BBS Communications The Business Center" ("Manager Toolkit") which was the foundation for the Benefits Center Scorecards setting standards for liability acceptance rates and other metrics that impacted company profitability. A copy of the Manager Toolkit is attached herewith as **EXHIBIT C.**

40. It is significant that the Unum Group established the Manager Toolkit while it was still trying to satisfy regulatory requirements under the RSA.

41. Under the Manager Toolkit employees are rewarded financially by achievement of corporate, insurance subsidiary and individual performance goals.

42. Unum Group has various compensation programs available to different levels of employees, including, the Performance Based Incentive Plan ("PBI Plan"), for non-sales

employees of the Unum Group.

43. Unum Group officers, at the level of Assistant Vice-Presidents and above, and Unum Group physicians, are eligible to participate in the Long Term Incentive Plan ("LTI Plan") and earn awards which can be in the form of restricted stock units, deferred cash or stock options.

44. Each year, the Board of Directors Human Capital Committee approves a corporate budget for all base salary increases and for financial rewards under the PBI plan and LTI Plan.

45. Whether there is a payout to eligible employees under the PBI Plan depends on factors, including whether Unum Group achieved a minimum level of financial performance.

46. Unum Group management sends to its Claim Directors, or makes available to the Claims Directors, Weekly Tracking – Quarter Review reports focusing on the number of claims that management expects will turn into a "recovery" at specified time periods. A copy of a Weekly Tracking – Quarter review report is attached herewith as **EXHIBIT D**.

47. Unum Group management sends to its Claims Directors, or makes available to the Claims Directors, IDI Director Scorecard reports focusing on the number of claims that it expects will turn into a "recovery" at specified time periods and whether projections have been met.  A copy of IDI Scorecard reports is attached herewith as **EXHIBIT E**.

48. IDI Scorecards are color-coded, green showing that expectation is being met, and yellow or red showing an expectation is not met.

49. Routinely Vice-Presidents have discussions, often on a weekly basis with Assistant Vice-presidents to go-over performance metrics of teams under each Assistant Vice-President focusing on whether teams are meeting forecasted "recoveries."

50. Assistant Vice-Presidents have access to OMAR to view performance metrics, including the number of expected claims "recoveries" and expected aggregate dollars associated with "recoveries."

51. Assistant Vice-Presidents sometimes receive paper documents from the Vice-President level alerting them about specific claims, including the name of the insured and the claim reserve.

52. The management of claims is disclosed in *Unum Group v. Timothy P. Loftus*, United States District Court for the District of Massachusetts, No. 16-cv-40154-TSH, Unum Group filed as Dkt. No. 1-6 in an "Upjohn Warning" where Unum Group investigated Mr. Loftus for

> - Improperly coding claim closures to achieve performance metrics and/or plan forecast;
> - Paying benefits on an under a reservation of rights (ROR) or on an "exceptional basis to be of service to the claimant" to achieve "paid recovery" performance metrics;
> - Paying benefits without disability or eligibility being fully evaluated;
> - Paying benefits prior to obtaining appropriate medical confirmation confirming disability determination.

The "Upjohn Warning" is attached as **EXHIBIT F.**

53. Unum Group's Worcester Benefit Center practice of focusing on "recoveries" and the financial performance of the Worcester Benefits Center creates a likelihood that claims personnel were influenced, consciously or unconsciously, to tend to deny, or to terminate otherwise worthy claims, such as Mr. Walls'.

E. *Information Regarding Mr. Wall's Injury And The Unum Group Insurance Policies.*

54. By occupation, Mr. Walls is an accountant.

55. Over a number of years, Mr. Walls purchased Unum Life individual insurance policies and riders identified as EP87, LA86, LS6086, RSD86, ND186 and others ("Policies" hereinafter).

56. Of particular significance, Mr. Walls paid for Lifetime Monthly accident benefits for total disability under Unum Life rider policy LA86.

57. The LA86 promises to pay benefits as long as Mr. Walls is disabled from performing his occupation, if the disability is due to an accident, and the accident happened before Mr. Walls turned 65.

58. LA86 provides in part Lifetime Accident Benefit Rider

When used in this rider only:
"Total disability" and "totally disabled" mean
1. injury restricts the lnsured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation; and
2. the Insured is receiving medical care from someone other than himself which is appropriate for that injury.
Except for "total disability" and "totally disabled," all terms used in this rider which are defined in this policy shall have the meaning given to them in the policy.

On the later of the policy anniversary when the lnsured's age is 65 or the end of the Maximum Benefit Period, the Disability Benefit Provision is amended to read as follows:

We will pay the Maximum Disability Benefit in any month after the Insured has satisfied the Elimination
Period that:
1 the Insured is totally disabled; and
2. that total disability:
    a. is the result of injury which occurred before the policy anniversary
when his age was 65 and while this rider was in effect; and

    b. began before the policy anniversary when his age was 65 and has been continuous until the month for which this benefit is payable

59. On February 1, 2012 Mr. Walls was scheduled for surgery and medical records document the Mr. Walls was in an excellent pre-operative state of health.

60. On February 8, 2012 underwent a Bilateral Nerve-Sparing Robot Assisted Radical Prostatectomy at the Faulkner Hospital in Boston, Massachusetts, and the surgeon performing the operation injured Mr. Wall's bladder.

61. As a result of the bladder injury, Mr. Walls became totally disabled and the Unum Defendants paid disability benefits to Mr. Walls from the first date of eligibility up to and including May 14, 2014.

62. Mr. Walls became disabled while he was 64 years of age.

63. The Unum Defendants terminated benefits on May 14, 2014 contending that Mr. Walls was disabled solely due to sickness and that he did not qualify for lifetime accident benefits.

64. Mr. Walls appealed to the Unum Defendants repeatedly to change their decision.

65. The Unum Defendants refused to admit that Mr. Walls was disabled due to an injury.

66. The Unum Defendants conceded that Mr. Walls is occupationally disabled but contended that his disability is due to sickness and not an accident. For example, on July 16, 2016 Unum Group and Unum Life wrote

> Based on our review, we are not changing our initial determination that your restrictions and limitations are the result of a Sickness as defined in your policy. Benefits are not payable under the Lifetime Accident Benefit Rider included in your policy. The maximum benefits under the Maximum Benefit Period have been paid as of May 14, 2014.

67. For example, on July 29, 2016 Unum Group and Unum Life wrote

> We have reviewed, your request for reconsideration of benefits under the Lifetime Accident Benefit Rider of your policy and have determined Individual Disability benefit payments are not approved under this rider. This is because the information available to us indicates that your restrictions and limitations are due to a Sickness. Benefits were paid to the Maximum Benefit Period of May 14, 2014 and no further benefits are payable.

68. At all times material hereto, Mr. Walls has been "totally disabled" within the meaning of the terms of the policies, and has been entitled to be paid disability benefits, and he continues to be disabled to date.

69. This lawsuit follows Mr. Walls' written demands for payment of benefits.

## COUNT I

## BREACH OF CONTRACT AGAINST ALL DEFENDANTS

### (Maine Law)

70. Mr. Walls repeats and realleges the allegations set forth in the preceding paragraphs and incorporates the same by reference.

71. Under Maine law ambiguities in insurance contracts must be construed strictly against the insurer and liberally in favor of the insured. *Pelkey v. General Elec. Capital Assur. Co.*, 804 A.2d 385, 389 (Me. 2002).

72. The Policies define the term "Injury" "means harm caused by an accident."

73. The Policies define the term "Sickness" "means a mental or physical illness or condition which has been diagnosed or treated."

74. Both the Policies' definitions of "Injury" and "Sickness" are ambiguous and the Court must construe the terms liberally to afford coverage for Mr. Walls.

75. The surgeon who injured Mr. Walls during surgery may have been negligent but there is no evidence that the surgeon purposefully sought to injure Mr. Walls, so the surgeon's action was "accidental" and caused an "injury" when viewed in the context of the Policies.

76. The Unum Defendants breached the Policies by refusing to pay benefits after May 14, 2014.

77. The Unum Defendants owe lifetime coverage and lifetime payment of benefits under the Policies to Mr. Walls.

78. As a direct and proximate result of the Unum Defendants' breach of contract under the insurance policies, the Unum Defendants caused damages to Mr. Walls.

## COUNT II

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS

**(Maine Law)**

79. Mr. Walls repeats and realleges the allegations set forth in the preceding paragraphs and incorporates the same by reference.

80. All of the Unum Defendants breached the covenant of good faith and fair dealing implied in the terms of the Policies by failing to pay benefits due to Mr. Walls as expected.

81. Mr. Walls suffered emotional distress damages as a result of the Unum Defendants' acts and omissions.

82. As a direct and proximate result of the acts and omissions of the Unum Defendants in refusing to pay benefits, Mr. Walls suffered damages.

## COUNT III

## **UNFAIR CLAIMS SETTLEMENT PRATICES AGAINST ALL DEFENDANTS**

### (Maine Law Violation of 24-A M.R.S.A. § 2436-A)

83. Mr. Walls repeats and realleges the allegations set forth in the preceding paragraphs and incorporates the same by reference.

84. The Unum Defendants' conduct as stated herein was in bad faith in that, *inter alia* in violation of 24-A M.R.S.A. § 2436-A

(a) The Unum Defendants misrepresented pertinent facts or policy or contract provisions relating to coverages at issue, such as contending an injury was a sickness;

(b) The Unum Defendants failed to follow the promises set-forth in the RSA, such as by fairly adjudicating Mr. Walls' claim;

(c) The Unum Defendants failed to acknowledge and review claims, which may include payment or denial of a claim, within a reasonable time following receipt of written notice by the insurer of a claim by an insured arising under the policies;

(d) The Unum Defendants refused to pay claims without conducting a reasonable investigation based upon all available information;

(e) The Unum Defendants did not attempt in good faith to effectuate prompt, fair and equitable settlement of claims in which the company's liability under the policy had become reasonably clear.

85. The Unum Group controls the actions of Unum Life.

86. Mr. Walls provided timely proof of loss to the Unum Defendants.

87. The Unum Defendants payments to Mr. Walls are overdue.

88. The actions of the Unum Defendants as set-forth herein were committed in wanton, malicious and/or reckless disregard of the rights of Mr. Walls rights and without a reasonable basis, the lack of which reasonable basis the Unum Defendants knew or recklessly disregarded, thereby justifying an award under the Maine statute, 24-A M.R.S.A. § 2436-A

89. Unum Defendants owe to Mr. Walls under the applicable statute, benefits plus interest at the rate of 1 and ½ percent per month and an award of reasonable attorney's fees.

## COUNT IV

## UNFAIR TRADE PRACTICES AGAINST ALL DEFENDANTS

### (Maine Law Violation of 5 M.R.S.A. § 207)

90. Mr. Walls repeats and realleges the allegations set forth in the preceding paragraphs and incorporates the same by reference herein.

91. The Maine Unfair Trade Practices Act (the "UTPA") provides a private right of action for any "person who purchases or leases goods, services or property ... for personal, family or household purposes and thereby suffers any loss of money or property ... as a result of the use or employment by another person of" an unfair trade practice.

92. At all times material hereto, the Unum Defendants have been engaged in trade or commerce within in the meaning the UTPA.

93. Mr. Walls has made repeated demand on the Unum Defendants in writing and has waited more than 30-days for the Unum Defendants to afford the relief sought, namely payment of all monies due to him under the Policies.

94. The aforementioned acts and omissions of the Unum Defendants caused losses to Mr. Walls that are recoverable under Section 213 of the UTPA.

95. In addition to the monetary relief sought under the Policies, Mr. Walls is entitled to recover attorney's fees and costs under Section 213 of the UTPA.

## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

**(Maine Law)**

96. Mr. Walls repeats and realleges the allegations set forth in the preceding paragraphs and incorporates the same by reference herein.

97. The Unum Defendants: (a) intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from their conduct; (b) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;" (c) Mr. Walls suffered emotional distress; and (d) the emotional distress suffered by Mr. Walls was so severe that no reasonable person could be expected to endure it.

98. The Unum Defendants intentionally caused emotional distress to Mr. Walls.

**WHEREFORE,** Plaintiff Ronald E. Walls demands relief and judgment against the Unum Defendants, jointly and severally, as follows:

1. Award damages to Ronald E. Walls against the Unum Defendants, jointly and severally, in an amount which this Court shall determine to be necessary and proper to compensate Ronald E. Walls for his injuries together with pre-judgment interest from the date of breach of contract, post-judgment interest, reasonable attorney' fees, and costs;

2. Award damages to Ronald E. Walls against the Unum Defendants as allowed under the UTPA and 24-A M.R.S.A. § 2436-A , including prejudgment interest from the date of the breach of contract, 30-days after, at the rate of 1 and ½ percent per month, post-judgment interest and costs and reasonable attorneys' fees and all other relief allowed by these statutes;

3. Award damages to Ronald E. Walls against the Unum Defendants for emotional distress, based on the Unum Defendants intentional conduct ;

4. Award damages to Ronald E. Walls against the Unum Defendants for emotional distress based on the Unum Defendants breach of the covenant of good faith and fair dealing;

5. Reinstate benefits ordering Unum Defendants to pay monthly benefits to Ronald E. Walls until such time that Unum Defendants have a lawful reason to stop; and

6. For such other and further relief as this Court deems just and proper, including consequential damages.

## JURY DEMAND

Ronald E. Walls demands a trial by jury on all issues triable by jury.

                RONALD E. WALLS

                Respectfully Submitted,

                */s/Jonathan M. Feigenbaum*
                Jonathan M. Feigenbaum, Esq.
                B.B.O. No.546686
                184 High Street
                Suite 503
                Boston, MA 02110
                Tel. No. : (617) 357-9700
                FAX No.: (617) 227-2843
                jonathan@erisaattorneys.com